# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| FILO FOODS, LLC; BF FOODS, LLC; ALASKA AIRLINES, INC.; and THE WASHINGTON RESTAURANT ASSOCIATION,<br><br>               Respondents,<br><br>               v.<br><br>CITY OF SEATAC,<br><br>               Respondent,<br><br>SEATAC COMMITTEE FOR GOOD JOBS,<br><br>               Petitioner. | No. 70758-2-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION<br><br>FILED: February 10, 2014 |

LEACH, C.J. — The First Amendment to the United States Constitution protects statutorily created initiative rights. It requires this court to subject any burden on the exercise of these rights to exacting scrutiny. Petitioner SeaTac Committee for Good Jobs (Committee) seeks discretionary review of a trial court decision prohibiting the placement of an initiative measure on the ballot and striking the signatures of those registered voters who signed supporting petitions multiple times. Because the statute requiring this result impermissibly burdens the First Amendment rights of these voters, the trial court committed error that

substantially altered the status quo. As a result, we previously accepted review and reversed the trial court. We now explain.

FACTS

In June 2013, the Committee, a coalition of individuals, businesses, neighborhood associations, immigrant groups, civil rights organizations, people of faith, and labor organizations, circulated a proposed ballot initiative entitled "Ordinance Setting Minimum Employment Standards for Hospitality and Transportation Industry Employers" (Proposition One). This initiative proposed an ordinance setting minimum employment standards for hospitality and transportation employers, including an hourly minimum wage of $15.

The Committee collected 2,506 signatures on supporting petitions and filed them with the City of SeaTac (City). The SeaTac Municipal Code (SMC) required that the proposed petitions be supported by at least 1,536 signatures to qualify for the November 2013 general election ballot. As required by the SMC, the City submitted the petitions to the King County Department of Elections, as ex officio supervisor of city elections, to determine the sufficiency of the signatures. On June 30, 2013, the King County Elections Supervisor validated 1,780 signatures, enough to qualify Proposition One for the ballot. On June 28, 2013, the city clerk issued a certificate of sufficiency.

On July 2, 2013, Filo Foods LLC, BF Foods LLC, Alaska Airlines Inc., and The Washington Restaurant Association (Challengers) filed a challenge to the certificate of sufficiency. The Challengers could not confirm that the City would

convene its petition review board before the time to seek judicial review of the certificate of sufficiency expired. Therefore, they filed this action on July 8, 2013, and scheduled a hearing for July 19, 2013. The City then confirmed that its board would convene the afternoon of July 19, 2013. As a result, the trial court denied the Challengers' requested relief without prejudice to return if dissatisfied with the City's actions.

At the board's hearing, the Challengers attacked the validity of many signatures. The board agreed with the Challengers in part and struck 201 signatures accepted by King County. But the board rejected the Challengers' attack on 61 signatures of people who signed the petition multiple times. The board determined that 1,579 signatures supported the petition, 43 more than the minimum number required. On July 23, 2013, the city clerk issued a final certificate of sufficiency.

The City placed the ordinance on the city council's agenda for action on July 23, 2013. The council declined to adopt the ordinance but called for it to be placed on the November 5, 2013, ballot. The Challengers then sought writs of review, mandate, and prohibition in the trial court. The Challengers raised a single issue: did RCW 35A.01.040(7) require that the City strike all signatures, including the original, of each person who signed the petition two or more times?

On August 26, 2013, the trial court entered a detailed order granting the Challengers' requested writs. The trial court characterized the issue before it as the "constitutionality and enforceability of RCW 35A.01.040(7)." The court found

-3-

the statute both constitutional and enforceable. Its decision removed Proposition One from the November 5, 2013, ballot.

The Committee sought emergency discretionary review in this court. After receiving briefing and hearing oral argument, this court entered an order reversing the trial court on September 6, 2013. That order stated that an opinion explaining the reasons for this decision would follow in due course. This opinion provides that explanation.

## CRITERIA FOR DISCRETIONARY REVIEW

The Committee seeks discretionary review under RAP 2.3(b)(2): "The superior court has committed probable error and the decision of the superior court substantially alters the status quo or substantially limits the freedom of a party to act." The parties agree the superior court's decision substantially changed the status quo. It removed Proposition One from the ballot, depriving the voters of SeaTac the opportunity to vote for or against it. As explained below, the trial court erred. Therefore, we granted review and reversed the trial court.

## ANALYSIS

The Committee asks this court to decide if a statute that denies a registered voter signing a petition multiple times the right to have one signature counted violates the First Amendment. The City contends the Committee cannot raise this issue because it failed to do so in the trial court. Because RAP 2.5(a) allows us to consider for the first time on appeal a "manifest error affecting a

-4-

constitutional right," we address the constitutionality of RCW 35A.01.040(7) in the context of the First Amendment.

A statute that voids all initiative signatures of a person signing the initiative more than once burdens that individual's First Amendment rights.[1] An individual expresses a view on a political matter by signing an initiative petition.[2] The signature generally expresses the view that the law proposed by the initiative should be adopted but may express the more limited political view that the voters should decide the question.[3] In either case, this expression of a political view implicates the signer's First Amendment rights.[4]

Although the federal constitution does not guarantee the right to an initiative, once a state creates an initiative procedure, the state may not place restrictions on the exercise of the initiative that unduly burden First Amendment rights.[5] SeaTac is a noncharter code city. Washington has conferred upon code cities the right to provide for the exercise of the powers of initiative and referendum.[6] SeaTac has granted these powers to its voters.[7] RCW 35.17.240-

---

[1] See Taxpayers United for Assessment Cuts v. Austin, 994 F.2d 291, 298 (6th Cir. 1993) (holding a Michigan statute excluding the signatures of any person signing a petition twice to be rationally related to Michigan's interest in protecting against fraud in its initiative system).

[2] Doe v. Reed, 561 U.S. 186, 130 S. Ct. 2811, 2817, 177 L. Ed. 2d 493 (2010).

[3] Reed, 130 S. Ct. at 2817.

[4] Reed, 130 S. Ct. at 2817.

[5] Meyer v. Grant, 486 U.S. 414, 420, 108 S. Ct. 1886, 100 L. Ed. 2d 425 (1988).

[6] RCW 35A.11.080.

[7] SMC 1.10.040.

.360 governs the exercise of the initiative power by SeaTac voters.[8] In addition, RCW 35A.01.040 imposes requirements for all petitions, including initiative petitions, to be signed and filed with a code city. This includes the requirement at issue in this case: "Signatures, including the original, of any person who has signed a petition two or more times shall be stricken."[9] We must decide if this provision unduly burdens the First Amendment rights of SeaTac voters who signed Proposition One.

United States Supreme Court precedent indicates that we should review RCW 35A.01.040 under an "exacting scrutiny" standard. Three cases provide this direction. The Court first addressed the standard for reviewing state regulation of ballot initiatives in 1988. In Meyer v. Grant,[10] the Court unanimously applied an "exacting scrutiny" review standard to a Colorado law prohibiting the payment of initiative petition circulators.

A decade later, the Court again addressed First Amendment issues in a challenge to post-Meyer Colorado laws regulating ballot initiatives. In Buckley v. American Constitutional Law Foundation, Inc.,[11] the Court considered First Amendment challenges to Colorado's registration, badge, and disclosure requirements for ballot initiative circulators. Writing for a five-justice majority, Justice Ginsburg cautioned, "'[N]o litmus-paper test' will separate valid ballot-

---

[8] RCW 35A.11.100.
[9] RCW 35A.11.040(7).
[10] 486 U.S. 414, 420, 108 S. Ct. 1886, 100 L. Ed. 2d 425 (1988).
[11] 525 U.S. 182, 183, 119 S. Ct. 636, 142 L. Ed. 2d 599 (1999).

access provisions from invalid interactive speech restrictions, and this Court has come upon 'no substitute for the hard judgments that must be made.'"[12] She also noted that the Court has allowed states "considerable leeway to protect the integrity and reliability of the ballot-initiative process."[13]

Most recently, in Doe v. Reed,[14] the Court considered the applicable standard of review in the context of a First Amendment challenge to a request for referendum petitions made under the Washington Public Records Act, chapter 42.56 RCW. The Court observed the relevancy of the electoral context to its First Amendment review.[15] It also noted the significant flexibility allowed states in implementing their own voting systems. Following its precedents considering First Amendment challenges to disclosure requirements in the electoral context, the Court held the "exacting scrutiny" standard applicable.[16]

The Reed Court stated that the "exacting scrutiny" standard required "'a substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."[17] To survive this scrutiny, "'the strength of the governmental interest must reflect the seriousness of the actual burden on First

---

[12] Buckley, 525 U.S. at 183 (alteration in original) (quoting Storer v. Brown, 415 U.S. 724, 730, 94 S. Ct. 1274, 39 L. Ed. 2d 714 (1974)).

[13] Buckley, 525 U.S. at 183.

[14] 561 U.S. 186, 130 S. Ct. 2811, 2815, 177 L. Ed. 2d 493 (2010).

[15] Reed, 130 S. Ct. at 2818.

[16] Reed, 130 S. Ct. at 2818.

[17] Reed, 130 S. Ct. at 2818 (internal quotation marks omitted) (quoting Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 130 S. Ct. 876, 914, 175 L. Ed. 2d 753 (2010)).

Amendment rights.'"[18] The Court noted that a state's interest in preserving electoral integrity extended "to efforts to ferret out invalid signatures caused not by fraud but by simple mistake, such as duplicate signatures."[19] Thus, we must measure the strength of this interest against the burden RCW 35A.01.040 places on First Amendment rights.

In Sudduth v. Chapman,[20] the Washington Supreme Court measured the strength of this interest against the burden placed on our state's constitutional rights of initiative and referendum by a statute denying voters who signed a petition more than once the right to have one signature counted and found it wanting. In Suddeth, the court considered the constitutionality of RCW 29.79.200, which provided, "'If the secretary of state finds the same name signed to more than one petition[,] he shall reject the name as often as it appears.'"[21] Article II, section 1 of the Washington Constitution reserves the power of the initiative to the people. The State contended that RCW 29.79.200 especially facilitated the initiative process and therefore did not exceed the legislature's authority. The court rejected this argument.

The court stated,

> Were there some showing of facts upon which the legislature could reasonably have found that this provision was necessary to facilitate the initiative process and guard its integrity, we would, of

---

[18] Reed, 130 S. Ct. at 2818 (quoting Davis v. Fed. Election Comm'n, 554 U.S. 724, 128 S. Ct. 2759, 2775, 171 L. Ed. 2d 737 (2008)).

[19] Reed, 130 S. Ct. at 2819.

[20] 88 Wn.2d 247, 252, 558 P.2d 806 (1977).

[21] Sudduth, 88 Wn.2d at 249.

course, be obliged to defer to the legislative judgment; but since no state of facts which would justify it has been proposed, in order to protect the right of the people which was reserved by them in their constitution, we must hold this portion of RCW 29.79.200 to be in excess of the legislative authority granted.[22]

The court noted that the State made no claim the challenged provision was necessary to guard against fraud and mistake.[23] It then observed that while 20 states have constitutions providing for initiative and referendum, its research had not disclosed any comparable statute.[24]

The court quoted the following observation:

"In view of the multiplicity of petitions which are circulated before each election, it is not surprising that some honest citizens may become so confused by the number of petitions presented to them that they may inadvertently sign two or more for the same measure. This, of course, is carelessness on their part, but if they are legally entitled to sign, we think one signature should be allowed and the others stricken."[25]

We find Suddeth controlling. While the State's interest in preserving electoral integrity extends to ferreting out duplicate signatures caused by mistake, striking all—instead of counting the first and striking the duplicates—overburdens voters' First Amendment rights.

The trial court distinguished Suddeth on the basis that it addressed a statute burdening the constitutional right of the people to enact statewide legislation, while RCW 35A.01.040(7) only burdens a statutory right of the people to enact city or county legislation. But the United States Supreme Court has

---

[22] Sudduth, 88 Wn.2d at 252.
[23] Sudduth, 88 Wn.2d at 251.
[24] Sudduth, 88 Wn.2d at 251.
[25] Sudduth, 88 Wn.2d at 252 (quoting Whitman v. Moore, 59 Ariz. 211, 228, 125 P.2d 445 (1942)).

recognized First Amendment protection for the exercise of state-created initiative rights even though the United States Constitution does not guarantee these rights.[26] Thus, once a state creates initiative rights by statute, those rights enjoy First Amendment protection. The First Amendment protection does not depend upon a constitutional origin for the initiative right.

## CONCLUSION

The First Amendment protects statutorily created initiative rights. Any burden on the exercise of these rights is subject to exacting scrutiny. To guard against fraud and mistake, the State does not need to deny a voter who signs petitions more than once the right to have one signature counted. Therefore, we hold the provision of RCW 35A.01.040(7) requiring the striking of all of a voter's signatures unconstitutional.

_Leach, C.J._

WE CONCUR:

_Spearman, J._

---

[26] Meyer, 486 U.S. at 428.

Filo Foods, LLC v. City of Seatac, No. 70758-2-I

DWYER, J. (concurring) — I wholeheartedly agree with the majority opinion. I write separately to address two remaining, vexing issues, both of which arise from the city's institution of its Petition Review Board.

At the time of the instant dispute, the city's Petition Review Board consisted of its mayor, its city manager, and its acting police chief. Both its method of creation and its membership speak to its existence as a component of the city's executive branch.

The relevant city ordinance provides that: "The Board shall consider and act upon any evidence or reports of temporary or permanent alteration of petitions, or any other matters relating to initiative and referendum petitions which the Board may determine to warrant investigation, report to the City Council, or legal action." SeaTac Municipal Code 1.10.170. This is a broad grant of power, given the ordinance's "or any other matters" language.

From the briefing, it appears that the city's representatives are of the opinion that the Petition Review Board possesses at least two powers that it can not lawfully possess.

Initially, the Petition Review Board can not, and therefore does not, possess the power to rule on the legal sufficiency of the subject matter of a petition. To the contrary, "the determination of the validity of an initiative is 'exclusively a judicial function.'" Eyman v. McGehee, 173 Wn. App. 684, 692, 294 P.3d 847 (2013) (quoting Philadelphia II v. Gregoire, 128 Wn.2d 707, 714, 911 P.2d 389 (1996)). "[R]eviewing the substance of a proposed initiative is

exclusively a judicial function, not a role for other governmental actors." <u>Eyman</u>, 173 Wn. App. at 690.

Nor does the Petition Review Board possess the power to second-guess, countermand, or modify the county auditor's[1] determination as to the number of valid signatures contained on a petition or the validity of any individual voter's signature set forth thereon. The authority to make these determinations is vested solely in the county auditor.

The relevant statute provides:

**Sufficiency of petitions.** *Wherever in this title petitions are required to be signed and filed, the following rules shall govern the sufficiency thereof:*

. . .

(3) The term "signer" means any person who signs his or her own name to the petition.

(4) To be sufficient a petition must contain valid signatures of qualified registered voters or property owners, as the case may be, in the number required by the applicable statute or ordinance. Within three working days after the filing of a petition, *the officer with whom the petition is filed shall transmit the petition to the county auditor for petitions signed by registered voters*, or to the county assessor for petitions signed by property owners *for determination of sufficiency.* The officer or officers whose duty it is to determine the sufficiency of the petition shall proceed to make such a determination with reasonable promptness and shall file with the officer receiving the petition for filing a certificate stating the date upon which such determination was begun, which date shall be referred to as the terminal date. Additional pages of one or more signatures may be added to the petition by filing the same with the appropriate filing officer prior to such terminal date. Any signer of a filed petition may withdraw his or her signature by a written request for withdrawal filed with the receiving officer prior to such terminal date. Such written request shall so sufficiently describe the petition as to make identification of the person and the petition certain. The name of any person seeking to withdraw shall

---

[1] In King County, the election-related duties of the county auditor have been assigned by charter to the Director of the Elections Department. Because the relevant statute references the county auditor, so will I.

2

be signed exactly the same as contained on the petition and, after the filing of such request for withdrawal, prior to the terminal date, the signature of any person seeking such withdrawal shall be deemed withdrawn.

RCW 35A.01.040 (emphasis added).

This statute makes clear that, in the case of petitions signed by registered voters, it is the county auditor who is charged by law with the "duty" "to determine the sufficiency of the petition." This statute is unambiguous. It is found in Title 35A RCW, the title that allows for the establishment of optional municipal code cities and defines how such cities shall be governed and operated. SeaTac is an optional municipal code city. This statute, by its plain language, does not accommodate a city Petition Review Board sitting as an appellate authority over the work of the county auditor. The city's arguments to the contrary, premised as they are on statutory provisions found in other RCW titles or on the general plenary power of optional municipal code cities, are unavailing.

In short, the SeaTac Petition Review Board acts unlawfully when it rules on the legal sufficiency of the subject of a petition or second-guesses the determination of the county auditor as to the "sufficiency of the petition."

I have no doubt that the council members of SeaTac are good, well-intentioned people. They clearly do not fear the popular will—if they did, they would not have granted their residents initiative and referendum powers in the first place. I am confident that they will avail themselves of the opportunity to reconsider the problematic ordinance herein discussed.

3